**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF KENTUCKY
NORTHERN DIVISION AT COVINGTON**

**CIVIL ACTION NO. 2:19-00054 (WOB-CJS)**

**JENNIFER HALL, ET AL.**                                    **PLAINTIFFS**

**VS.**                    <u>**MEMORANDUM OPINION AND ORDER**</u>

**KENTON COUNTY, KENTUCKY,
ET AL.**                                                    **DEFENDANTS**

This is a civil rights action brought pursuant to 42 U.S.C. § 1983 to recover damages for the death of plaintiffs' child which occurred while her expectant mother, plaintiff Jennifer Hall, was incarcerated at the Kenton County Detention Center.

The case is currently before the Court on the parties' motions for summary judgment (Docs. 77, 102, 103, 105) and motions to exclude expert witnesses. (Docs. 96, 101, 104). The Court previously heard oral argument on these motions and took them under submission. (Doc. 127).

The Court now issues the following Memorandum Opinion and Order.

*Factual and Procedural Background*

A.   <u>**KCDC, SHP, and Relevant Policies and Regulations**</u>

The Kenton County Detention Center ("KCDC") is a local jail in Covington, Kentucky, and it also serves a 125-bed inpatient treatment facility for inmates with substance abuse disorders.

(Merrick Dep., Doc. 77-9, at 7; Carl Dep., Doc. 77-7, at 4-5). It is licensed by the Kentucky Cabinet for Health and Family Services as an "alcohol and other drug treatment entity ("AODE"). *See* 908 KAR 1:370. At all relevant times, Terry Carl was the Jailer of the KCDC. (Carl Dep. 4).

Kentucky law requires that a jail such as the KCDC contract with a healthcare provider licensed in Kentucky to provide medical care for inmates. 501 KAR 3:090 § 1(1). That regulation also states: "The health care staff shall not be restricted by the jailer in the performance of their duties except to adhere to the jail's security requirements." 501 KAR 3:090 § 1(3).

Pursuant to this regulation, the KCDC contracts with defendant Southern Health Partners, Inc. ("SHP") "to provide for the delivery of al medical, dental and mental health services to inmates of [the] Jail." (Doc. 77-3 at 1) (Health Services Agreement). In turn, SHP contracted with defendant Mark J. Schaffield, M.D. to serve as the SHP Medical Director at the KCDC. His contract required him to visit the KCDC on a weekly basis and take calls from SHP on-site medical staff as needed. (Doc. 123 at 8).

A drug that is at issue in this case, Buprenorphine, is a medication approved by the Food and Drug Administration to treat

2

opioid-use disorders as a medication-assisted treatment ("MAT").[1] Some products containing Buprenorphine, alone or in combination with other drugs, carry the names Subutex and Suboxone. *Id.*

The Kentucky Board of Medical Licensure has promulgated detailed regulations entitled "Professional standards for prescribing or dispensing Buprenorphine-Mono-Product or Buprenorphine-Combined-with-Naloxone." 201 KAR 9:270. These regulations establish extensive requirements for Kentucky physicians who prescribe these drugs, including:

- The doctor must obtain and maintain a waiver and license from the Drug Enforcement Administration;
- The doctor must complete certain continuing educational programs;
- **The doctor must, at least two weeks prior to initiating treatment with these drugs, obtain a complete evaluation of the patient, including medical history, family history, physical examination, and drug screen;**
- The doctor must obtain the patient's consent and authorization to obtain her medical records;
- **The doctor must explain treatment alternatives, risks, and benefits to the patient;**
- **The doctor must obtain written informed consent from the patient;**
- **A doctor prescribing Buprenorphine to a pregnant patient "shall first obtain and document consultation with another independent physician that the potential benefit of [the drug] use outweighs the potential risk of use;"**
- The doctor shall recommend to the patient "an in-office observed induction protocol;"
- **The doctor must, prior to administering the first dose, document the presence of opioid withdrawal using a standardized clinical withdrawal scale;**
- The doctor must document all information in the patient's

---

[1] https://www.samhsa.gov/medication-assisted-treatment/medications-counseling-related-conditions/buprenorphine (last visited June 28, 2022).

medical record so as to enable the board to determine whether the doctor is conforming to these regulations and professional standards.

(*Id.*) (emphasis added).

SHP has its own "Policy and Procedure Manual for Health Services in Jails." In a section titled "Intoxication and Withdrawal," the policy states: **"Pregnant females on Methadone are not to be detoxed and should continue on the Methadone program she is currently following. Report to the Jail Administrator any pregnant female on Methadone, and ensure compliance with continuing such medication."** (Doc. 110-8 at 2) (emphasis added).

Jailer Terry Carl testified that he relied on SHP to make all medical decisions regarding KCDC inmates; he has no medical training beyond first aid and CPR; and he had never seen SHP's policy concerning intoxication and withdrawal prior to this litigation. (Carl Dep. 14-16, 19).

## B.   Plaintiff Jennifer Hall

Plaintiff Jennifer Hall ("Hall") was booked into the KCDC on April 19, 2018 to serve 180 days for contempt of court. (Hall Dep., Doc. 77, at 145). She was then 30 years old and nearing the end of her pregnancy, with a due date of June 2, 2018. The baby was a girl, and her parents had named her Serenity. (Hall Dep. 105). Hall was also addicted to opioids and had been prescribed Methadone since March of 2016 to manage her addiction. (Hall Dep. 41).

During her first month at the KCDC, Hall was transported each

4

morning to a Methadone clinic in Covington for treatment, along with five other pregnant inmates with opioid-use disorders: Erica Brumley, Jennifer Dovenbarger, Lisa Helton, Hayleigh Popp, and Jessica Holland. (Hall Dep. 60-62; Dovenbarger Dep., Doc. 97-4, at 9).

Hall was also transported to St. Elizabeth medical offices for weekly pre-natal appointments. On May 24, 2018, Hall had a checkup, including an ultrasound which showed that the baby's weight, heart rate, amniotic fluid level, stress level, and fetal kick count were all within normal levels. (Doc. 101-1; Kramer Dep., Doc. 77-12, at 26). The report stated: "Audible fetal movements are noted and fetal movements are perceived by the patient." (*Id.* at 3).

The next day, May 25, 2018, Hall had a follow-up office visit, and the doctor noted: "Fetus is active. [H]aving some contractions." (Doc. 101-2 at 2).

C.   **The Medication Change**

On May 25, 2018, SHP Nurse and Medical Administrator, defendant Shawnee Thoman, received a verbal order from Dr. Schaffield to switch the pregnant inmates at the KCDC from Methadone to Buprenorphine, effective the following Monday. (Thoman Dep., Doc. 77-5, at 62). Thoman relayed this information to SHP defendant LPN LaShae Setters. (Setters Dep., Doc. 77-6, at 61-62).

5

Sometime that weekend, Hall heard through the grapevine that the pregnant inmates would no longer be going to the Methadone clinic but instead would be switched to Buprenorphine/Suboxone. (Hall Dep. 73-76). Dovenbarger testified that during their Friday trip to the Methadone clinic, one of the deputies told the pregnant inmates that they were "going to start giving our medication to us at the jail, because Pewee Valley was not taking any pregnant ladies anymore, that they were at max capacity . . . [a]nd now all of the pregnant drug addicts were now Kenton County Detention Center's responsibility. And that it was better for a pregnant woman to be on Subutex than it was to be on methadone." (Dovenbarger Dep. 43; Popp Dep., Doc. 106-1, at 37-37). The pregnant inmates were again transported to the Methadone clinic on Saturday, May 27, 2018 and Sunday, May 28, 2018. (Dovenbarger Dep. at 14).

Early on the morning of Monday, May 28, 2018, the pregnant inmates with opioid disorders were taken to the KCDC medical office where Setters and two deputies were present. (Hall Dep. 79-82; Dovenbarger Dep. 16-17; Popp Dep. 44-49). Setters told the women that instead of being taken to the Methadone clinic that day, they would be given Buprenorphine. Hall testified that she asked if it was okay to take the new medication because her baby was nearly full term, and Setters told her that a doctor approved it. (Hall Dep. 82). Hall asked if her own doctors had approved it, and "they"

6

said yes. (Hall Dep. 83). Hall testified that she then "did what they told me to do." (Hall Dep. 83).

Brumley vocally objected to the medication change. She told Setters that "even though methadone is not an opioid, you still cannot take methadone and then take Subutex, because the Subutex will kick the methadone out of our system and throw us into withdrawal." (Dovenbarger Dep. 18, 79-80). Dovenbarger and Popp testified that when Hall and Brumley voiced concerns, Setters told them that everything had been worked out with the inmates' own obstetricians and that the switch was "perfectly safe." (Dovenbarger Dep. 18-19; Popp Dep. 45-50). Brumley nonetheless refused to take the Buprenorphine.

One of the deputies then contacted KCDC Deputy defendant Carrie Ray, who responded to the medical unit. (Doc. 102-4, Incident Report; Ray Dep., Doc. 77-8, at 27). Dovenbarger testified that Ray told the inmates that they were "retarded for thinking that they would put our children in harm's way," and to "just take the medicine and stop being difficult." (Dovenbarger Dep. 20, 80, 88-89). Brumley told Ray that she "was not taking anything until I speak with my OB directly." (Doc. 102-4; Popp Dep. 50-54). Ray told Brumley that the SHP doctor had spoken with HealthPoint, to which Brumley responded, "Your fucking Doctor doesn't even give the meds that the pregnant girls are supposed to get." (*Id.*). Ray testified that she did not actually know for a fact that Dr.

7

Schaffield had spoken to HealthPoint, but it was her "impression" from the nurses. (Ray Dep. 33). Dr. Schaffield confirmed in his deposition that Ray's statement was untrue, and that he never spoke to HealthPoint about the medication change, and he "didn't talk to any OB about anybody." (Schaffield Dep., Doc. 77-4, at 200-01).

Ray testified that at this point Brumley was cursing and screaming. (Ray Dep. 30-31). Finding Brumley to be "disruptive," Ray instructed a deputy to place Brumley in an isolation/observation cell "pending disciplinary action." (Doc. 102-4). The cell in which Brumley was placed contained a toilet and sink and no place to sit other than a concrete ledge. (Ray Dep. 50-51). After approximately three hours in that cell, Brumley agreed to take the Buprenorphine and was moved to a regular cell.

In the meantime, the other inmates agreed to the new medication and each was given 16 milligrams of Buprenorphine, although they had all been on differing doses of Methadone. (Dovenbarger Dep. 22-23).

Around 1:00 p.m., Brumley told a deputy that she was experiencing withdrawal symptoms and bleeding. (Setters Dep. 102; Schaffield Dep. 203-06). Ray contacted the medical staff, and Setters assessed Brumley and took her vital signs. Setters called Dr. Schaffield to inform him, and he stated that her vitals were in the normal range. Per Dr. Schaffield's instructions, Setters had Brumley moved to a booking cell and placed on a 10-minute

8

watch. (Setters Dep. 102-07).

Dr. Schaffield went to the KCDC around 3:00 p.m. to see Brumley; however, he did not check on any of the other pregnant inmates. (Schaffield Dep. 208-12).

No one from the medical staff discussed this medication change with the pregnant inmates prior to that morning, and the women were not given the opportunity to talk to their treating doctors. (Dovenbarger Dep. 23-24). Prior to initiating the medication change, Dr. Schaffield never met with, talked to, or evaluated Hall or any of the other pregnant inmates. (Hall Dep. 59-60; Schaffield Dep. 107, 133). He testified that "I didn't get written consent from anybody for the switch." (Schaffield Dep. 215). Further, there was no plan in place to monitor the pregnant inmates for symptoms of withdrawal after the switch or to check the vital signs of the women or their babies. (Setters Dep. 53, 98-99).

Hall, who observed Brumley's removal to isolation, took the Buprenorphine. Hall testified that she was not given the option to stay on Methadone. (Hall Dep. 78).[2]

Hall testified that, within 45 minutes of taking the Buprenorphine, she was in "complete withdrawal" and extremely sick, with sweating, agitation, crawling skin, weakness, and

---

[2] Dovenberger and Popp also testified that the pregnant inmates were given no choice about the medication change. (Dovenberger Dep. 64; Popp Dep. 59-60).

shakiness. (Hall Dep. 71, 86-88). She testified that she told someone, possibly a "Deputy Kay," and the nurses that something was wrong, but they "kept brushing it off for hours." (Hall Dep. 72, 88).[3] Popp, who was in the cell with Hall, also began detoxing, and the two women told the guards that they needed to see the nurse. (Popp Dep. 62-65). The guard told them that the nurse would be around soon. When Setters came around about an hour later, Hall and Popp told her about their symptoms and that they felt like they were in withdrawal. (Popp Dep. 66-68). Setters told them she would let the doctor know; she did not take their temperatures, check their vitals, or ask about their babies. (*Id.*).[4]

Hall testified that by the following morning, her baby was

---

[3] Dovenberger testified that she too immediately went into withdrawal, which persisted that day and night. (Dovenberger Dep. 28-29, 55-56). The next morning, around 7 a.m., she told Setters that she had been sick after taking the Buprenorphine and that she did not want to take the second dose. After signing a refusal paper, Dovenberger was taken to an isolation cell, along with Lisa Helton, who had also refused the second dose. (Dovenberger Dep. 31-35, 58). Thereafter, Jason Merrick, the KCDC Director of Addiction Services, came to speak to them to assure them that it was "100% safe" for the pregnant inmates to take the Buprenorphine. (Dovenberger Dep. 37). Merrick told them he would speak to the doctor and Ray to see if they could get out of isolation, but when he came back he said they would have to remain there until they took the Buprenorphine or started to withdraw. Dovenberger then agreed to take a half dose, as did Helton. Around lunchtime, they were returned to their regular cells. (Dovenberger Dep. 38-39).

[4] Setters, however, testified that she could not recall hearing any complaints from the pregnant inmates that they were experiencing withdrawal symptoms after taking their first dose of Buprenorphine. (Setters Dep. 53).

not moving as much as usual and by approximately 5:00 a.m., she felt no more movement. (Hall Dep. 88, 102). Hall testified that Serenity was very active in the womb until Hall took her first dose of Buprenorphine. (Hall Depo. 56).

At 7:47 a.m., Hall was given a second dose of Buprenorphine, which she vomited up. (Hall Dep. 109).[5] Setters noted that she would "notify MD."[6] Setters testified that she called Dr. Schaffield to tell him about Hall vomiting, and he said to "monitor the patient." (Setters Dep. 73-74). However, Setters did nothing further to check on Hall and instead relied on Hall to alert the guards if she experienced problems. (Setters Dep. 74-80).

Around noon, Hall, feeling that something was wrong, asked a bunkmate to tell the nurse that she was in labor so that she could be taken to the hospital. (Hall Dep. 91-94, 105-06, 111). Thoman and Setters then arranged for Hall to be transported to St. Elizabeth Hospital. (Setters Dep. 81-83).

D.   **Serenity is Delivered Stillborn**

When Hall arrived at St. Elizabeth Hospital, she told the

---

[5] Popp also threw up her second dose of Buprenorphine. (Popp Dep. at 75-76).

[6] A note Thoman later entered in Hall's chart indicates that Schaffield had given the instruction to "continue to monitor patient." Thoman testified that such a general instruction would not cause the nurses to do anything, but the inmate could ask for help if they needed it. (Thoman Dep. 85-89).

medical staff that felt she was in withdrawal; that her Methadone had been discontinued the previous day and that she had been started on Buprenorphine; and that she was concerned about her baby. (Kramer Dep. 29-30; Clements Dep., Doc. 105-6, at 27-28). The medical staff conducted an ultrasound and told Hall that they could not detect the baby's heartbeat. (Hall Dep. 116; Kramer Dep. 26). The attending midwife, Sister Mary Kay Kramer, then requested a formal ultrasound by maternal-fetal staff, which confirmed that the baby was dead. (Kramer Dep. 27).[7]

At some point, Kramer called Dr. Schaffield to confirm the timeline of Hall's medication change, and Dr. Schaffield confirmed that Hall had been switched from Methadone to Buprenorphine the previous day. (Kramer Dep. 56-57). When Hall's obstetrician, Dr. Martin Clements, learned that there were other pregnant inmates who had undergone the same medication change, he too called Dr. Schaffield.[8] Dr. Schaffield did not know how many pregnant opioid-addicted inmates there were at KCDC, so he put Dr. Clements in touch with a nurse at the jail. (Clements. Dep. 41). Dr. Clements testified that he discussed with Dr. Schaffield the risks of switching pregnant women directly from Methadone to Buprenorphine,

---

[7] The ultrasound also showed that the baby had grown since the ultrasound performed five days earlier. (Kramer Dep. 28).

[8] Dr. Schaffield testified that it was he who called Dr. Clements. (Schaffield Dep. 225). This is immaterial.

and Dr. Schaffield did not appear to understand those risks at all. (Clements Dep. 44).

Dr. Clements then recommended that the other five pregnant inmates be transported to St. Elizabeth for assessment. (Clements Dep. 39-41). Later that evening, those inmates were brought to the hospital, evaluated, given ultrasounds, blood work, and fluids; four were kept for a least 24 hours. (Clements Dep. 43; Popp Dep. 79-84; Dovenbarger Dep. 40-43; Kramer Dep. 69). All presented with signs of withdrawal. (Clements Dep. 41-42).

Dr. Clements also contacted Dr. Beth Myers, who was the primary care physician for the pregnant inmates, including Hall, at HealthPoint in Covington. Dr. Myers told Dr. Clements that she had never heard of Dr. Schaffield and had not spoken to anyone at the KCDC about switching the pregnant inmates from Methadone to Buprenorphine. (Clements Dep. 60).

Meanwhile, Hall's labor was induced, and she delivered Serenity just after 7:00 p.m. (Kramer Dep. 32). The umbilical cord was loosely, but not tightly, wrapped around the baby's neck. Kramer, who has delivered over 3,500 babies, testified that a so-called "nuchal" cord is extremely common, and there was nothing about Serenity's appearance that made Kramer think she had been dead for a long time. (Kramer Dep. 32-33, 42, 70-71). Instead, Kramer testified that Serenity looked like a "healthy, sleeping baby," and her skin was still pinkish. (Kramer Dep. 36, 42). Black

13

and white photos of the baby taken several hours after her birth are in the record. (Doc. 101-6 at 1-4).

As part of the grieving process, Hall was allowed to keep Serenity in the room with her, and the baby remained at room temperature so that her mother could hold her. (Kramer Dep. 43). The following night, Powers and family members came to the hospital for a short ceremony. (Kramer Dep. 43; Hall. Dep. 124). Serenity remained in Hall's hospital room at room temperature until late in the evening on May 31, 2018. (Clements Dep. 71). Her remains were collected by Cincinnati Children's Hospital the next day.

On June 2, 2018, Dr. Daniel Leino, a pathologist, performed an autopsy on Serenity's body. (Doc. 101-8) Dr. Leino opined that, based upon the degree of maceration of Serenity's skin and "regressional changes in the placenta," that the "likely" cause of death was an umbilical cord compromise occurring in a "setting of oligohydramnios, possibly due to a missed rupture of membranes." (Doc. 101-8 at 12). He further opined that Serenity's death occurred 72 hours to one week prior to delivery. (*Id.*). However, he also noted that it "is uncertain whether the transition from methadone to Subutex may precipitate labor" and that "[o]pioid withdrawal may be especially harmful to an unborn baby, potentially resulting in preterm labor, fetal distress, or even miscarriage." (*Id.*).

In his deposition, Dr. Leino testified that he had assumed

that Serenity's body had been refrigerated before it was received at Children's Hospital. (Leino Dep., Doc. 105-11, at 29, 37). He also testified that he had assumed that the condition of her body at the time of autopsy was the same as when she was delivered. He further testified that the degree of maceration he observed was the primary basis for his opinion that Serenity had died 72 hours to one week before delivery. (Leino Dep. 44-47). Finally, his assessment of the stage of maceration led him to discount Hall's report of decreased fetal movement the day before Serenity was delivered and to discount the possibility of withdrawal contributing to Serenity's death. (Leino Dep. 55, 67, 87).

**E.   Dr. Clements Files a Complaint with the Kentucky Medical Board Against Dr. Schaffield**

On June 18, 2018, Dr. Clements filed a complaint against Dr. Schaffield with the Kentucky Board of Medical Licensure. (Doc. 103-10). This 4-page letter detailed the pregnant inmates' abrupt medication change initiated by Dr. Schaffield, and it listed seven areas in which Dr. Clements believed Dr. Schaffield's actions were professionally deficient. (Doc. 103-10 at 3-4). A doctor appointed by the Board to investigate the matter, Dr. William Craig Denham, concluded that Dr. Schaffield "did engage in conduct which fails to meet the standard of care;" "does exhibit gross negligence;" and was a "possible danger to his patients." (Doc. 103-11).

The Board followed up with Dr. Denham, requesting details in

15

support of his opinion. Dr. Denham responded:

> The whole issue is simple.
>
> 1.   The only reason to use Subutex in pregnancy is if methadone is not readily available. The patients in question were already getting methadone.
>
> 2.   Opiate withdrawal can induce spontaneous abortion/fetal demise. Withdrawal was caused by destabilizing patients medication regimen for no other reason than convenience.

(Doc. 103-11 at 2).

The Board ultimately admonished Schaffield, but by that time he had retired. (Doc. 103-12; Schaffield Dep. 43).

**F.    This Lawsuit**

Hall and Serenity's father and administrator of her estate, Daniel Powers, filed this lawsuit on April 30, 2019, alleging that defendants violated Jennifer and Serenity's rights under the Eighth and Fourteenth Amendments. They also allege state law claims of negligence, gross negligence, and loss of consortium. (Doc. 1). Plaintiffs named as defendants Terry Carl; Kenton County; Carrie Ray, Southern Health Partners, Inc.; Dr. Mark Schaffield; Shawnee Thoman, RN; and LaShae Setters, LPN. All individuals are sued in that capacity. Plaintiffs have now conceded that their claims against SHP and Thoman should be dismissed.[9]

---

[9] Plaintiffs apparently have also waived any claims for emotional damages on their behalf. (Hall. Dep. 36).

16

*Analysis*

## A.   8th Amendment Claims: General Legal Principles

"The Eighth Amendment's prohibition on cruel and unusual punishment generally provides the basis to assert a § 1983 claim of deliberate indifference to medical needs." *Phillips v. Roane Cty., Tenn.*, 534 F.3d 531, 539 (6th Cir. 2008) (citation omitted). Such a claim has both an objective and subjective component. *Id.*

For the objective component, the plaintiff must demonstrate the existence of a "sufficiently serious" medical need. *Id.* A serious medical need is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention. *Preston v. County of Macomb*, Case No. 18-12158, 2019 WL 3315280, at *6 (E.D. Mich. July 24, 2019) (quoting *Jones v. Muskegon Cty.*, 625 F.3d 935, 941 (6th Cir. 2010) (internal quotations omitted)).

Both treatment for opioid withdrawal and being in a high-risk pregnancy may constitute serious medical needs. *See Brawner v. Scott Cty.*, 14 F.4th 585, 598 (6th Cir. 2021) (jury could find that pretrial detainee who was taking suboxone for opioid addiction had objectively serious medical need); *Turner v. Knox Cty. Det. Facility*, No. 3:15-CV-266-TAV-CCS, 2016 WL 6775431, at *4 (E.D. Tenn. Nov. 15, 2016) (plaintiff who alleged denial of medical care for her high-risk pregnancy states deliberate indifference claim);

17

*Mori v. Allegheny Cty.*, 51 F. Supp.3d 558, 575 (W.D. Pa. 2014) (inmate who was seven and one-half months pregnant, prescribed Methadone, and had been diagnosed as a high-risk pregnancy had serious medical condition for purposes of deliberate indifference claim).

The subjective component "requires a plaintiff to 'allege facts which, if true, would show that the official being sued subjectively perceived facts from which to infer substantial risk to the prisoner, that he did in fact draw the inference, and that he then disregarded that risk.'" *Phillips*, 534 F.3d at 540 (quoting *Comstock v. McCrary*, 273 F.3d 693, 703 (6th Cir. 2001)). Although this requirement is meant to prevent the "constitutionalization of medical malpractice claims," a plaintiff "need not show that the officer acted with the specific intent to cause harm." *Id.*

Rather, deliberate indifference to a substantial risk of serious harm "is the equivalent of recklessly disregarding that risk." *Id.* "Officials, of course, do not readily admit this subjective component, so 'it [is] permissible for reviewing courts to infer from circumstantial evidence that a prison official had the requisite knowledge.'" *Id.* (quoting *Farmer v. Brennan*, 511 U.S. 825, 836 (1994)). *See also Burwell v. City of Lansing*, 7 F.4th 456, 472 (6th Cir. 2021) ("Although Kelley denies that he thought Phillips was in distress, the plaintiff need not offer explicit evidence that [the defendant] in fact drew the inference, because

18

[i]n most cases in which the defendant is alleged to have failed to provide treatment, there is no testimony about what inferences the defendant in fact drew.").

"In cases involving mistreatment by medical personnel, [the Sixth Circuit] has held that 'less flagrant conduct [than that of other government officials] may constitute deliberate indifference.'" *Phillips*, 534 F.3d at 544 (quoting *Terrance v. Northville Reg'l Psychiatric Hosp.*, 286 F.3d 834, 843 (6th Cir. 2002)). A doctor "has a duty to do more than simply provide some treatment to a prisoner who has serious medical needs; instead, the doctor must provide medical treatment to the patient without consciously exposing the patient to an excessive risk of serious harm." *Id.* (internal quotations and citation omitted).

To determine whether a doctor's conduct may be found deliberately indifferent, the Court asks "whether a reasonable doctor in his position could have concluded that a substantial risk of serious harm to [the plaintiff] existed." *Id.* The Sixth Circuit has also framed this question as whether the care provided was "so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." *Terrance*, 286 F.3d at 844 (citation omitted). *See also Shadrick v. Hopkins Cty.*, 805 F.3d 724, 744 (6th Cir. 2015) ("Grossly inadequate medical care may establish deliberate indifference."); *Taylor v. Franklin Cty.*, 104 F. App'x 531, 541 (6th Cir. 2004)

19

(applying "grossly inadequate medical care" standard).

"For summary-judgment purposes, it is sufficient that 'defendants *could* have perceived a substantial risk of serious harm to [plaintiff]. Whether in fact they perceived, inferred, or disregarded that risk is an issue for trial.'" *Smith v. Campbell Cty.*, Case No. 16-13-DLB-CJS, 2019 WL 1338895, at *9 (E.D. Ky. Mar. 25, 2019) (quoting *Clark-Murphy v. Foreback*, 439 F.3d 280, 290 (6th Cir. 2006)). In addition, "[e]xpert testimony that speaks to the obviousness of the risk can be used to demonstrate a dispute of material fact regarding whether a prison doctor exhibited conscious disregard for the plaintiff's health." *Id.*

Further, a jury is entitled to discredit the credibility of a defendant who claims that he or she did not perceive a substantial risk of serious harm to a prisoner. *See Burwell*, 7 F.4th at 476 ("It may well be true that Kelly did not see the vomit and genuinely believed that Phillips was asleep. But that is for the jury to decide.") (internal quotations and citation omitted); *Brooks v. Shank*, 660 F. App'x 465, 469 (6th Cir. 2016) ("It is for the jury to decide whether Dr. Shank is credible."); *Carter v. City of Detroit*, 408 F.3d 305, 312 (6th Cir. 2005) ("Although Hollins claims that he only 'elected' to act, and did not actually believe that Carter was ill, a jury would be entitled to discount that explanation."); *Taylor v. Franklin Cty.*, 104 F. App'x 531, 541 (6th Cir 2004) ("Material facts exist as to whether Defendant

Maxwell's professed ignorance towards Plaintiff's vocalized medical needs is proven and whether her conduct caused grossly inadequate medical care in violation of the Eighth Amendment.").

The subjective component of a deliberate indifference claim must be addressed for each defendant individually. *Winkler v. Madison Cty.*, 893 F.3d 877, 890 (6th Cir. 2018) (citation omitted).

Finally, the "principle is well settled that private medical professionals who provide healthcare services to inmates at a county jail qualify as government officials acting under the color of state law for purposes of § 1983." *Winkler*, 893 F.3d at 890 (citing *Harrison v. Ash*, 539 F.3d 510, 521 (6th Cir. 2008)). *See, e.g., Smith*, 2019 WL 1338895, at *7-8 (holding that SHP and doctor with whom it contracted to provide medical care at jail were proper defendants in § 1983 action).

**B.    Motions for Summary Judgment**

      **1.    The KCDC Defendants**

          **a.    Eighth Amendment Claims**

Kenton County defendants Terry Carl and Carrie Ray assert that they are entitled to qualified immunity on plaintiffs' claims for deliberate indifference.

"The qualified-immunity doctrine shields government officials performing discretionary functions from civil liability unless their conduct violates clearly established rights." *Burwell*, 7 F.4th at 476 (internal quotations and citation omitted). "Thus, a

defendant is entitled to qualified immunity on summary judgment unless the facts, when viewed in the light most favorable to the plaintiff, would permit a reasonable juror to find that: (1) the defendant violated a constitutional right; and (2) the right was clearly established." *Id.*

### 1.   **Terry Carl**

Terry Carl, who was Jailer of the KCDC at the time of these events, is sued in his individual capacity. (Doc. 1). However, even construing the facts in plaintiffs' favor, Carl is entitled to qualified immunity because he did not violate Hall's constitutional rights.

It is undisputed that Carl had no personal contact with Hall while she was at the KCDC, and he did not even know that she was in the jail. (Carl Dep. 26). Hall also testified that she never met Carl or expressed any concerns to him while she was incarcerated. (Hall Dep. 163).

Carl further testified that he relied on SHP to make all medical decisions regarding KCDC inmates. (Carl Dep. 14-16). He testified that he did not know why Schaffield made the decision to switch the pregnant inmates' medication. (Carl Dep. 31).

It is well established that "[p]ersons sued in their individual capacities under § 1983 can be held liable based only on their own unconstitutional behavior." *Heyerman v. Cty. of Calhoun*, 680 F.3d 642, 647 (6th Cir. 2012). They cannot be held

liable under a theory of respondeat superior; rather, they must have "either encouraged the specific incident of misconduct or in some other way directly participated in it." *Id.*

Plaintiffs argue that Carl "had a duty to supervise the activities of the medical staff" and that he was deliberately indifferent by turning over the jail's medical care to SHP. Plaintiffs' arguments fail for several reasons.

First, Kentucky law requires jails such as the KCDC to contract with a healthcare provider licensed in Kentucky to provide medical care for inmates. 501 KAR 3:090 § 1(1). Moreover, that regulation specifically prohibits jailers from restricting the health care staff "in the performance of their duties except to adhere to the jail's security requirements." 501 KAR 3:090 § 1(3).

To the extent that plaintiffs argue that the policy decision to contract with SHP is somehow itself facially unconstitutional, such a theory would not apply to Carl in his individual capacity; it would apply to Kenton County. Moreover, it has been rejected by the Sixth Circuit. *Winkler*, 893 F.3d at 901 ("[A] municipality may constitutionally contract with a private medical company to provide healthcare services to inmates.").

Further, non-medical jail staff are entitled to reasonably rely on assessments made by medical staff. *Id.* at 895. *See also Greene v. Crawford Cty.*, 22 F.4th 593, 608 (6th Cir. 2022) ("[A] non-medically trained officer does not act with deliberate

indifference to an inmate's medical needs when he reasonably deferred to the medical professionals' opinions.") (internal quotations and citation omitted); *McGaw v. Sevier Cty,* 715 F. App'x 495, 498 (6th Cir. 2017) ("Here, the officers had no reason to know or believe that Nurse Sims's recommendation was inappropriate, and thus did not act with subjective deliberate indifference when they followed it."); *Smith*, 2019 WL 1338895, at *21; *Preston v. Cty. of Macomb*, Case No. 18-12158, 2019 WL 3315280, at *9 (E.D. Mich. July 24, 2019) ("Absent a reason to believe (or actual knowledge) that prison doctors or their assistants are mistreating (or not treating a prisoner, a non-medical prison official . . . will not be chargeable with the Eight[h] Amendment scienter requirement of deliberate indifference.") (internal quotations and citation omitted).

For example, the plaintiff in *Hamilton v. Pike Cty.*, Civil No. 11-99-ART, 2013 WL 529936 (E.D. Ky. Feb. 11, 2013), made arguments nearly identical to those which plaintiffs make here. The plaintiff there suffered from a variety of medical problems when he was booked into the county jail. That jail also contracted with SHP to provide medical care to inmates. The SHP medical staff failed to recognize that the plaintiff was extremely ill, and he was ultimately hospitalized with acute renal failure, deep venous thrombosis, and sepsis, among other conditions, requiring multiple surgeries which left him largely confined to a wheelchair. *Id.* at

24

3-4.

The plaintiff sued the jailer, alleging that he was deliberately indifferent by relying on SHP to treat the plaintiff, by failing to supervise SHP staff, and by failing to override SHP's medical decisions. *Id.* at *6-7. The district court rejected all these arguments, holding that the jailer "reasonably relied on the assumption that the medical staff would attend the [the plaintiff's] medical needs." *Id.* at *7. The court also noted that the jailer's reliance was reasonable because there was no history of complaints about the jail medical staff and that Kentucky law prohibits jail staff from interfering with the medical staff's performance of their duties. *Id.*

Therefore, Carl is entitled to qualified immunity on plaintiffs' claims for deliberate indifference.

### 2.   **Carrie Ray**

Defendant Carrie Ray was a Sergeant at the KCDC. She testified that she has no medical training beyond first aid and CPR; she received no training from the medical staff, and she is not familiar with SHP's policies or Kentucky regulations concerning medical care of inmates. (Ray Dep. 13-16).

Ray testified that she had no involvement in the decision to switch the pregnant inmates' medications and no knowledge of what risks may be associated with such change. (Ray Dep. 20, 25). Further, no one from the medical staff told Ray that the pregnant

inmates needed to be monitored after the medication change. (Ray Dep. 52-54).

The law cited above applies equally to Ray — she too was entitled to rely on SHP staff to make medical decisions regarding KCDC inmates. And, as noted, Kentucky regulations prohibit jail staff from interfering with medical staff unless safety is implicated. This authority also defeats plaintiffs' arguments that Ray had any duty to medically monitor the pregnant inmates after the medication change.

Plaintiffs next argue that Ray somehow violated Hall's right to informed consent when she responded to a request by a deputy to report to the medical unit because another inmate, Brumley, was protesting the medication change, and when Ray instructed the deputy to take Brumley to an isolation cell. (Doc. 110 at 6-9). This argument, to which plaintiffs devote only two conclusory paragraphs, fails.

The duty to obtain informed consent to a change in medical care—and here, specifically the prescription of buprenorphine—rests with the licensed, prescribing physician. 201 KAR 9:270. Plaintiffs cite no legal authority supporting their argument that a *jail deputy* bears any legal duty regarding a physician's decision about an inmate's medical care. Any violation of Hall's right to informed consent occurred when Dr. Schaffield ordered the medication change, not when non-medical jail staff implemented his

26

order.

Defendant Ray is thus also entitled to qualified immunity on plaintiffs' deliberate indifference claim.

### 3.   Kenton County

As noted above, plaintiffs' first argument as to Kenton County's alleged deliberate indifference—that it "abandoned" its responsibilities by contracting with SHP to provide medical care at the KCDC—has been rejected by the Sixth Circuit. *Winkler*, 893 F.3d 877, 901 (6th Cir. 2018).

Plaintiffs next argue that Kenton County may be liable on a "failure to train" theory. "It is settled that [o]nly where a municipality's failure to train its employees in a relevant respect evidences a deliberate indifference to the rights of its inhabitants can such a shortcoming be properly thought of as a city policy or custom that is actionable under § 1983." *Miller v. Calhoun Cty.*, 408 F.3d 803, 816 (6th Cir. 2005) (internal quotations and citation omitted). "Mere allegations that a [defendant] was improperly trained or that an injury could have been avoided with better training are insufficient to prove liability." *Id.*

Rather, a plaintiff must demonstrate "such a consistent and pervasive pattern of unconstitutional" conduct, "evidencing a failure to train," that it amounted to the municipality being deliberately indifferent to the rights of its citizens. *Berry v.*

27

*City of Detroit*, 25 F.3d 1342, 1346 (6th Cir. 1994). And, the plaintiff must prove that that the inadequate training "is closely related to" or "actually caused" the plaintiff's injury. *Id.*

Plaintiffs have offered no evidence that supports this claim. Their arguments about a lack of medical training are, in effect, a repackaging of their theory that Kenton County may be held deliberately indifferent for contracting with the SHP to provide medical care at the jail or for not questioning SHP's decisions. (Doc. 110 at 19-20).

Further, plaintiffs have not shown "that there was a history of similar incidents at the Correctional Facility, nothing to show that the County was on notice, and nothing to show that the County's failure to take meliorative action was deliberate." *Miller*, 408 F.3d at 816.

Although they do not say it, plaintiffs are effectively basing their failure to train theory on the single, tragic incident involving Hall. As the Court noted in *Miller*, however, "a single act may establish municipal liability only where the actor is a municipal policymaker." *Id.* Plaintiffs offer no authority for the proposition that an independently contracted doctor of an outside medical contractor could be deemed a "policymaker" for the contracting municipality.

Kenton County is thus entitled to summary judgment on plaintiffs' deliberate indifference claims.

28

**b.   State Law Claims Against County Defendants**

Count III of plaintiffs' complaint alleges claims for negligence and gross negligence against the County defendants. (Doc. 1 at 10).

First, plaintiffs concede that their negligence claims against Kenton County are barred by sovereign immunity. (Doc. 110 at 23 n.14). Accordingly, that claim must be dismissed.

Next, defendants Carl and Ray assert that the negligence claims against them are barred by qualified official immunity.

"Qualified official immunity protects *individual* public officials or employees who are sued in tort for their good-faith discretionary acts undertaken within the scope of their employment." *Shadrick v. Hopkins Cty.*, 805 F.3d 724, 749 (6th Cir. 2015) (citations omitted).

Plaintiffs do not clearly articulate their theory of negligence against Carl. They state that he is "clueless" about an inmate's right to informed consent, and that "his deputy jailers appear to receive no training whatsoever on their duty to monitor inmates for medical emergencies and respond accordingly." (Doc. 110 at 24).

Of course, such assertions are insufficient to show negligence by Carl given that Kenton County, pursuant to Kentucky law, contracted with SHP to perform those functions. To the extent that Carl has any individual duty with respect to medical matters,

29

it is clearly a discretionary decision on his part to rely on the medical judgment of the medical staff. Plaintiffs have alleged no facts which would support a finding that such reliance was in bad faith. *See Rowan Cty. v. Sloas*, 201 S.W.3d 469, 481 (Ky. 2006) (noting that bad faith would be shown if the public official "willfully or maliciously intended to harm the plaintiff or acted with a corrupt motive") (citation omitted).

The same may be said for defendant Ray regarding her reliance on the medical staff. And, as already noted, Kentucky regulations specifically *prohibit* jail staff from interfering with the medical staff in the performance of their duties unless jail security is implicated.

Additionally as to Ray, plaintiffs argue in their own cross motion for summary judgment (Doc. 102) that the Court should hold as a matter of law that Ray owed and breached a duty to Hall based on Hall's right to refuse Buprenorphine and continue taking Methadone. (Doc. 102 at 10). This argument is without merit.

First, as noted above, the duty under Kentucky law to obtain informed consent to a change in medical care, and here, specifically the prescription of buprenorphine, rests with the prescribing physician. 201 KAR 9:270. Ray was a jail sergeant, not medical personnel. It is undisputed that she had no role in Dr. Schaffield's decision to switch the pregnant inmates' medications, and she had no role in the informed-consent process.

30

Ray was simply called to the medical office by a deputy when another inmate, not Hall, was being disruptive in protesting the medication change.[10] Ray assessed the situation and, exercising the discretion her role afforded her, made the decision that Brumley should be removed to an observation cell. As already noted, Kentucky law *prohibits* jail personnel from restricting the medical staff in the performance of their healthcare duties, unless jail security is involved. So even had Ray wanted to interject herself into the implementation of the medication change, she was prohibited from doing so.

Thus, Ray breached no duty owed to Hall. Ray is also entitled to qualified official immunity because her decision to have Brumley removed to an isolation cell was a discretionary function within the scope of her job duties, and plaintiffs have shown no evidence that it was taken in bad faith.

---

[10] Plaintiffs proffered an "expert" witness, Patrick Hurley, who opined as to what effect Hall's observation of Brumley being removed from the medical office might have had on Hall's own reaction to the medication change. (Doc. 86-1). As will be discussed below, Hurley's opinion is moot given that plaintiffs' negligence claim against Ray fails as a matter of law.

31

2.   **The SHP Defendants**[11]

a.   **Nurse LaShae Setters**

1.   <u>**Deliberate Indifference**</u>

Plaintiffs base their claim for deliberate indifference against defendant Setters, an LPN employed by SHP, on her alleged violation of Hall's right to informed consent and her failure to "intervene" in Brumley's removal to an isolation cell after refusing the first dose of Buprenorphine. Even construing the record in plaintiffs' favor, however, the facts do not support a finding that Setters was deliberately indifferent to Hall's serious medical needs.

Setters learned of Dr. Schaffield's order that the KCDC pregnant opioid-addicted inmates be switched from Methadone to Buprenorphine from her supervisor, Nurse Shawnee Thoman, the Medical Team Administrator. (Setters Dep. 61-62). Neither Dr. Schaffield nor Thoman mentioned to Setters any concern about the pregnant inmates going into withdrawal as a result of the medication switch, and so Setters had no such concern. (Setters Dep. 57-58, 108-09). Rather, she understood from Thoman that Dr. Schaffield had done such medication switches "multiple times" at another jail, and she relied on that information. (Setters Dep.

---

[11] As previously noted, plaintiffs have no objection to the dismissal of their claims against SHP and Nurse Thoman. (Doc. 112 at 1).

63-64).

On the morning of May 28, 2018, Setters followed Thoman's instructions to dispense the Buprenorphine to the six pregnant inmates. Hall testified that Setters told her that the change had been approved by a doctor and, when she asked if her own doctors had approved it, "they" said yes. (Hall Dep. at 82-83). Inmates Dovenbarger and Popp testified that Setters told them that everything had been worked out with the inmates' own obstetricians and that the change was safe. (Dovenbarger Dep. 18-19; Popp Dep. 45-50).

When inmate Brumley vociferously protested, a jail deputy — not Setters — called for Ray to come to the medical office. (Ray Dep. 27). Ray then instructed the deputy to remove Brumley to an observation/isolation cell. (Doc. 102-4 at 1).

At the time of these events, Setters was unaware of SHP's policy that pregnant inmates taking Methadone should continue on that program. (Setters Dep. 55).

Plaintiffs argue that Setters failed to "reassure" Hall of her right to refuse the Buprenorphine and continue on Methadone. (Doc. 102 at 5). But, as noted above, the duty under Kentucky law to obtain informed consent to this medication change rests with the prescribing physician. 201 KAR 9:270. Second, Hall testified that after asking questions, she did not refuse the Buprenorphine, so Setters was not proceeding in the face of any refusal by Hall

33

to take the medicine.

Finally, Setters had been told by her supervisor that Dr. Schaffield, SHP's Medical Director for the jail, had ordered the medication change, and there is no evidence that Setters had any reason to question the appropriateness of his orders. Setters' deference to Dr. Schaffield's order was therefore not deliberate indifference. *See Hamilton v. Pike Cty.*, Civil No. 11-99-ART, 2013 WL 529936, at *12 (E.D. Ky. Feb. 11, 2013) (nurse's deference to SHP doctor's course of treatment not deliberately indifferent to plaintiff's serious medical needs).

Therefore, Setters is entitled to summary judgment on plaintiff's deliberate indifference claim.

### 2.    State Law Negligence Claim

As previously noted, Setters did not move for summary judgment on plaintiffs' state law negligence claims. However, plaintiffs have made their own motion for summary judgment, arguing that they are entitled to a ruling that Setters breached a duty she owed to Hall as a matter of law. (Doc. 102). Setters has opposed that motion. (Doc. 108).

Plaintiffs argue that Setters was negligent because she violated Hall's right to informed consent. There are at least two reasons why this argument fails.

First, per the above analysis, the "informed consent" at issue here is Hall's consent to the medication change from Methadone to

34

Buprenorphine. *But it is undisputed that Setters had no role in that decision – it was unilaterally and solely made by Dr. Schaffield*, and Kentucky law places the duty of obtaining the patient's informed consent on the prescribing physician. 201 KAR 9:270. Setters was simply carrying out a medical order given by the physician in charge at KCDC.

Second, by her own testimony, Hall did not object to taking the medication. She asked questions and then took it. Setters, therefore, did not dispense the medication in the face of any stated lack of consent.

Second, plaintiffs argue that Setters breached a duty to Hall by failing to intervene and "advocate for" *another* pregnant inmate, Erica Brumley, who vocally objected to the medication change. A deputy present then summoned Ray, who made the decision to have Brumley moved to an observation cell. Plaintiff proffers an expert report from Renee Dahring, a registered nurse with a background in correctional settings, who opines that Setters' failure to prevent Brumley's removal, "to intervene and advocate for her patients," was a "gross violation of the standard of care and dereliction of duty." (Doc. 102-12 at 4).

That expert's opinion notwithstanding, plaintiffs cite no authority whatsoever that Setter's alleged inaction towards Brumley triggered any duty that Setters owed to *Hall* regarding informed consent.

35

For these reasons, the state law negligence claims against Setters will be dismissed.

### b. Dr. Schaffield

### 1. Deliberate Indifference

The Court first notes with respect to Dr. Schaffield that although he is a state actor for the purposes of section 1983, he is not entitled to the defense of qualified immunity. *Hamilton*, 2013 WL 529936, at *9 (citing *McCullum v. Tepe*, 693 F.3d 696, 700, 704 (6th Cir. 2012)).

The only issue then as to the Eighth Amendment claim is whether a jury could reasonably find that Dr. Schaffield was deliberately indifferent to Halls' serious medical needs. The undisputed facts are more than sufficient to support such a conclusion.

As discussed above, the Kentucky Board of Medical Licensure has promulgated detailed, mandatory regulations which govern the prescription of Buprenorphine. 201 KAR 9:270. These regulations require, among other things, that:

- The doctor must obtain and maintain a waiver and license from the Drug Enforcement Administration;
- The doctor must complete certain continuing educational programs;
- **The doctor must, at least two weeks prior to initiating treatment with these drugs, obtain a complete evaluation of the patient, including medical history, family history, physical examination, and drug screen;**
- The doctor must obtain the patient's consent and authorization to obtain her medical records;

- **The doctor must explain treatment alternatives, risks, and benefits to the patient;**
- **The doctor must obtain *written informed consent* from the patient;**
- The doctor shall recommend to the patient "an in-office observed induction protocol;"
- **The doctor must, prior to administering the first dose, document the presence of opioid withdrawal using a standardized clinical withdrawal scale;**
- The doctor must document all information in the patient's medical record so as to enable the board to determine whether the doctor is conforming to these regulations and professional standards.

*Id.* (emphasis added).

The regulations also speak specifically to the administration of Buprenorphine to pregnant patients: **A doctor prescribing Buprenorphine to a pregnant patient "shall first obtain and document consultation with another independent physician that the potential benefit of [the drug] use outweighs the potential risk of use."** *Id.* (emphasis added).

The regulations further provide that violation of their requirements is automatically deemed "a failure to conform to the standards of acceptable and prevailing medical practice within the Commonwealth of Kentucky." *Id.*

SHP's own policy regarding "Intoxication and Withdrawal" states: **"Pregnant females on Methadone are not to be detoxed and should continue on the Methadone program she is currently following. Report to the Jail Administrator any pregnant female on Methadone, and ensure compliance with continuing such medication."**

(Doc. 110-8 at 2) (emphasis added). Dr. Schaffield's contract with SHP required him to review, support, and adhere to SHP treatment protocols, procedures, and policies. (Doc. 123 at 3-4; Schaffield Dep. 89).

Notwithstanding these extensive regulatory and policy requirements, it is undisputed that Dr. Schaffield took **none** of the mandatory precautionary measures before ordering that the pregnant opioid-addicted inmates at the KCDC be abruptly switched from Methadone to Buprenorphine:

- He never met with or examined any of the inmates, including Hall, or reviewed their medical histories;

- He did not know what dosage of Methadone each of the women had been taking and did not consult the doctors at the Methadone clinic;

- He did not talk to the pregnant inmates' obstetricians, even though he knew the women were receiving specialized obstetric services because their combined condition of being pregnant and having an opioid-use disorder placed them at high risk;

- He did not explain the risks and benefits of Buprenorphine;

- He did not get *any consent*, much less written consent, from the inmates for the change;

- He did not consult with another independent physician about the risks and benefits of such a change;

- He did not document the presence of opioid withdrawal prior to initiating the first dose of Buprenorphine;

- He made none of the documentation required by the regulations to certify compliance;

- He did no research and knew of no medical articles

38

endorsing switching a pregnant woman from Methadone to Buprenorphine;

- It "did not occur" to him to consult SHP's policy on withdrawal, although it was "readily available," and he had previously been required to read all SHP policies.

(Schaffield Dep. 30, 33, 34, 36, 78, 89, 106-07, 128-29, 145, 147, 201, 215)

Dr. Schaffield also made no plan for the inmates to be monitored for signs of withdrawal after the medication change, and there were no facilities at the jail for fetal monitoring. (Schaffield Dep. 53, 87, 216, 224). **This was despite the fact that he knew that the Food and Drug Administration had stated that because of the partial agonist properties of Buprenorphine, it might produce withdrawal symptoms in patients dependent on Morphine. (Schaffield Dep. 179-80).**

Dr. Schaffield's deposition testimony, as well as the testimony of two of plaintiffs' experts, provides ample evidence from which a jury could reasonably infer that he was deliberately indifferent to Hall's serious medical needs.

First, Dr. Schaffield testified that there was *no medical need to make the medication change.* (Schaffield Dep. 101). Instead, he merely argues that he believed that the change was safe because he had previously transitioned pregnant inmates in Clermont County, Ohio from street opiates, such as heroin and fentanyl, to Buprenorphine. However, he testified that he had *never*

39

transitioned a pregnant woman from *Methadone to Buprenorphine*. (Schaffield Dep. at 12, 15, 19, 25, 29).

This distinction is a medically critical one, and one which any reasonable doctor would have been aware of, according to plaintiffs' medical experts.

Dr. Jonathan Weeks, a physician licensed in Maternal-Fetal and Addiction Medicine who regularly cares for pregnant patients with substance abuse disorders, after reviewing relevant records and depositions in this matter, opined:

> An acute change from high-dose methadone to buprenorphine was below the standard of care for any patient. It displaces methadone from receptors and precipitates acute withdrawal.
> . . .
> An acute transition from high-dose methadone to buprenorphine is known to put the pregnancy for risk [of] stillbirth or neonatal distress (ACOG committee opinion #711, Am. J Obstet & Gynecol 1975: Fetal Stress from Methadone Withdrawal).
> . . .
> The acute change from high-dose methadone to buprenorphine precipitated adverse physiological effects that lead to the intrauterine fetal demise. Had Mrs. Jennifer Hall and her baby not been subjected to the effects of acute withdrawal, to a reasonable degree of medical certainty, I believe baby Hall would have survived and ultimately been born alive.

(Doc. 101-3).

In his deposition, Dr. Weeks explained that because Hall was due to deliver her baby in just a week or two, the Methadone-to-Buprenorphine switch "couldn't have been practically done safely." (Weeks Dep., Doc. 105-8 at 27). He further explained:

So when I'm saying acute, what I mean is the bu—
basically, I'm saying the buprenorphine caused a
removal of opioids from the opioid receptors, you
know, pure opioid agonist was replaced by a partial
opioid agonist. **So in a short period of time,
basically, the effects of her methadone were
eliminated.**
. . .
All I could say is the – the buprenorphine acted as
an antagonist against the methadone in a big way.
That's been previously described. ***This reaction was
predictable. And that's why there are so many
guidelines saying you shouldn't do it.***
. . .
**Acute withdrawal is predictable.**
. . .
But for Mrs. Hall, the fact that she was on such a
high dose of methadone put the baby at greater risk
[from the transition]. And the fact that she was
late in pregnancy put the baby at greater risk.

(Weeks Dep. 47,69-70) (emphasis added).

Plaintiff's second expert, Dr. Richard Blondell, a board-
certified addiction physician, also explained the differences
between Methadone and Buprenorphine that made the switch from the
former to the latter so dangerous for Hall:

Methadone is known as a potent "full agonist." It
binds to the same receptors in the brain to which
opioids such as fentanyl and heroin bind. . . . The
greater the dose, the greater the effect it has on
the brain's opioid receptors.
. . .
Buprenorphine is known as a "partial agonist." It
binds so tightly to opioid receptors in the brain
that it can block the effects of other opioids.
. . .
**However, the unique pharmacological properties if
methadone and buprenorphine pose serious clinical
challenges.** Patients who wish to switch from
buprenorphine to the more potent methadone can
usually do so without great difficulty. **However,
the switch from methadone to the less potent**

> **buprenorphine   is   more   difficult.**  Because
> buprenorphine   binds   more   tightly   to   opioid
> receptors in the brain than does methadone, it will
> attach itself to these receptors and bump methadone
> off of the receptors. **As a result, the phenomenon
> of "precipitated withdrawal" can occur in which
> patients may experience severe symptoms and signs
> of   the   opioid   withdrawal   syndrome   including:
> nausea,   vomiting,   diarrhea,   muscle   cramps,
> sweating, agitation and restlessness.** *Severe opioid
> withdrawal may also result in fetal distress if the
> patient is pregnant.*

(Blondell Report, Doc. 103-9 at 3-4) (emphasis added).

Dr. Blondell also explained that it is the standard of care for a pregnant woman on Methadone to continue Methadone until delivery. (*Id.* at 4). His testimony speaks directly to the test employed by the Sixth Circuit to assess deliberate indifference by a physician:

> **Any competent medical professional** would know or
> should know that a patient cannot be abruptly
> switched from methadone to buprenorphine because of
> the risk of "precipitated withdrawal." *This is
> especially true in the case of a pregnant woman. To
> order this switch late in pregnancy when the woman
> was near term indicates that the clinician is
> grossly incompetent with respect to the standard of
> care regarding the medication assisted treatment"
> of the opioid use disorders in pregnant patients
> and deliberately indifferent to patient suffering.*

(*Id.* at 5) (emphasis added).

Dr. Blondell notes that even the package inserts for Methadone and Buprenorphine warn against administering Buprenorphine to a patient receiving Methadone due to the risk of precipitated withdrawal. (*Id.* at 6-7). The Buprenorphine package insert states:

> There is little controlled experience with the transfer of methadone-maintained patients to buprenorphine. **Available evidence suggests that withdrawal appears more likely in patients maintained on higher doses of methadone (> 30 mg) and when the first buprenorphine dose is administered shortly after the last methadone dose.**

(Doc. 103-9 at 7) (emphasis added).

Dr. Blondell further testified that "switching a patient from methadone to buprenorphine is difficult, potentially hazardous even in the best of situations;" it is high risk; it should not be done with a pregnant woman; and "you shouldn't do it in the first place." (Blondell Dep. 81-85). And,

> Q.  Anything else that supports your opinion that the medical staff appears to be objectively unreasonable, grossly incompetent and deliberately indifferent, other than what we've already discussed?
> . . .
> A.  Let me pick this apart here. **Grossly incompetent, nobody should take a pregnant woman at term stable on methadone and try to convert her to buprenorphine in the final week or so of her pregnancy, that to me shows gross incompetence.**
>
> Q.  Unless, in your opinion, it's medically necessary.
>
> A.  **It's not medically necessary.**

(Blondell Dep. 102) (emphasis added).

Finally, Dr. Blondell stated that it was his opinion within a reasonable medical probability that Serenity died sometime between when Hall took her first dose of buprenorphine on May 28, 2018 and when she was delivered stillborn the following day.

43

(Blondell Dep. 114-15, 126).

In his deposition, Dr. Schaffield was asked about his awareness that Hall's pregnancy was full term, putting her in danger from the medication change:

> Q. Prior to Ms. Hall taking her first dosage of buprenorphine, were you aware of anything about Ms. Hall, her condition or the condition of her unborn child, that indicated to you that that might be a bad idea?
>
> A. The only thing I can say to that is I was told that there were a group of women who were on methadone. And I have to think back on this, because I think **one of the nurses, and I don't know who, told me that Jennifer Hall was close to term, or words to that effect. And when I heard that, I believe it did not register with me at the time**, and I'm not sure how else to state it other than that.
> . . .
> Q. And by that do you mean you forgot that, or at the time you didn't think it made any difference, or what do you mean when you say it didn't register with you?
>
> A. It means I think I heard what she said. Again, I'm trying to struggle back in time, **but when I say it didn't register, I guess I thought about it but I didn't think very long about it**, probably the best way to say it.
> . . .
> Q. Well, let me ask you this way; if you had thought longer about it when the nurse told you she was near full-term, **had you thought longer about it, do you think you would have switched her anyway?**
>
> A. **Probably not. If I thought she was going to have a baby in a few days, I don't think I would have.**

(Schaffield Dep. 187-89) (emphasis added).

Dr. Schaffield also claims to have been unaware of the

Kentucky regulations governing the prescription of Buprenorphine, although he obtained the DEA waiver described therein and completed the required continuing medical education. (Schaffield Dep. 92-96).

This testimony does not entitle him to summary judgment. Under Sixth Circuit authority, a jury would be entitled to discredit his testimony or, equally, conclude that a reasonable doctor exercising simple due diligence would have known of the regulations. *See Burwell v. City of Lansing*, 7 F.th 456, 476 (6th Cir. 2021); *Brooks v. Shank*, 660 F. App'x 465, 469 (6th Cir. 2016) ("It is for the jury to decide whether Dr. Shank is credible."); *Carter v. City of Detroit*, 408 F.3d 305, 312 (6th Cir. 2005); *Taylor v. Franklin Cty.*, 104 F. App'x 531, 541 (6th Cir 2004).

Finally, Dr. Schaffield's own testimony is replete with evidence supporting a finding of deliberate indifference. His testimony regarding informed consent bears quoting at length:

> Q.  Well, this provision – this paragraph four that we're referring here – referring to here doesn't say tell the patient that they are going to be switched. It says, explain treatment alternatives and the risk and the benefits of treatment with buprenorphine to the patient. Was that done for Ms. Hall before her medication was switched?
>
> A.  **I just said, I think, that I did not speak with Ms. Hall. The nurse did. The nature of that conversation, I don't know. I did not tell her anything about it. I never spoke with Ms. Hall.** . . .

> Q.   Do you know whether the person that spoke with Ms. Hall knew what buprenorphine was?
>
> A.   I don't.
>
> Q.   Do you know whether the person that spoke with Ms. Hall knew of any contraindications or potential side effects of the use of buprenorphine?
>
> A.   I don't. The only information they would have had would have been from me.

(Schaffield Dep. 132-34) (emphasis added).

And:

> Q.   Why didn't you tell these ladies about this switch?
>
> A.   I can't think of a particular reason why. I mean, I didn't tell people why I switched their blood pressure medicine. I didn't tell people why I increased their insulin does. And it all seems to work. **Again, in my opinion, it was not a big switch, in my opinion.** And so like these other drugs – like drugs, doctors switch them all the time. **It wasn't like we were doing chemotherapy, or she was having her gallbladder taken out or something. So you can say what you want about it, I guess. But it didn't occur to me at the time that this was a major event.**

(Schaffield Dep. 136) (emphasis added).

And finally:

> **Q.   So your process in effecting this change was to tell a nurse, of indeterminate knowledge, of the change that was being made other than it was being made, to tell the patients that a change was going to be made. And then it was left up to the patients to decide, without any knowledge of alternatives, risks or benefits whether they wanted to make that change or not. Is that your testimony? Is that how it worked?**
>
> **A.   Yeah, that's how it worked.**

46

(Schaffield Dep. 140-41) (emphasis added).

In the face of this evidence, Dr. Schaffield simply argues that he was exercising his "medical judgment" when he ordered the medication change, and that even if his decisions "fell below a professional standard or were negligent . . . they are nowhere near being so 'grossly incompetent' as to shock the conscience." (Doc. 105 at 11).

He is wrong. The Sixth Circuit has held that where the plaintiff produces significant evidence, including expert testimony, that a doctor's actions were "grossly inadequate," that he ignored certain information in a "cavalier" manner, and that he failed to follow policies and procedures relevant to the medical condition at issue, an assertion that the doctor was "exercising his medical judgment" does not preclude a finding of deliberate indifference. *Comstock*, 273 F.3d at 709. *See also Shadrick v. Hopkins Cty.*, 805 F.3d at 744); *Phillips*, 534 F.3d at 544; *Taylor*, 104 F. App'x at 541); *Terrance*, 286 F.3d at 845 ("Taken in the aggregate, Dr. Said's actions could constitute a finding of deliberate indifference to the decedent's serious medical needs because a jury could possibly decide that a reasonable doctor, in Dr. Said's position, would have concluded that a substantial risk of serious harm to the decedent existed."); *LeMarbe v. Wisneski*, 266 F.3d 429, 437-38 (6th Cir. 2001) (triable issue existed as to

whether doctor was deliberately indifferent; medical expert testified that the risk was "extreme and obvious to anyone with a medical education").

Finally, Dr. Schaffield has proffered no expert opinion of his own to refute this evidence.

Thus, because "there is sufficient evidence for a jury to conclude that [Dr. Schaffield] was deliberately indifferent to [Hall's] medical needs, the only remaining question is whether the right was clearly established." *See Burwell*, 7 F.4th at 476 (internal quotations and citation omitted).

In cases involving mistreatment by medical personnel, the Sixth Circuit has long held that "a doctor must provide medical treatment to the patient without consciously exposing the patient to an excessive risk of serious harm." *Phillips*, 534 F.3d at 544.

For the reasons already stated, a reasonable jury could conclude not only that Dr. Schaffield was deliberately indifferent to the serious risk posed by the medication change he ordered for Hall and other pregnant inmates at the KCDC, but it could conclude that Dr. Schaffield's actions were "so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." *Terrance*, 286 F.3d at 844 (citation omitted).

### 2.   **State Law Claims**

Given the above evidence, it is abundantly clear that

48

plaintiffs' motion for summary judgment against Dr. Schaffield on the duty and breach elements of their state law negligence claims should be granted.

Causation and damages, of course, will be questions for the jury.

## C.   **Motions to Exclude**

Under the Federal Rules of Evidence, "the trial judge must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Hamilton Cty. Emergency Comm. Dist. V. Level 3 Comm., LLC.*, 845 F. App'x 376, 383 (6th Cir. 2021) (quoting *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993)). This requirement has its roots in Rule 702, which allows a witness "qualified as an expert by knowledge, skill, experience, training, or education" to testify in the form of an opinion if four conditions are met. *Id.*

First, the expert's specialized knowledge "will help the trier of fact to understand the evidence or determine a fact in issue." Fed. R. Evid. 702 (a). Second, the testimony must be based on sufficient facts or data. Fed. R. Evid. 702(b). Third, the testimony is the product of reliable principles and methods. Fed. R. Evid. 702(c). Finally, the expert "has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702(d).

### 1.   **Patrick Hurley**

Because the claims against Kenton County, Carl, and Ray will be dismissed, the motion to exclude the testimony of Patrick H. Hurley is moot. That is because his proffered opinion relates only to the alleged violation of Hall's right to informed consent as a basis for the claims against the County defendants.

Moreover, Hurley's testimony would be excluded because it would not assist the trier of fact. Boiled down, his opinion is that because Hall saw Brumley removed to an isolation cell after she protested the medication change, Hall would have been afraid to refuse the Buprenorphine. (Doc. 86-1 at 12). This is not "expert" testimony; it is within the average layperson's knowledge; and plaintiff herself already testified as much. *See Berry v. City of Detroit*, 25 F.3d 1342, 1350 (6th Cir. 1994).

### 2.   **Dr. Matthew Thomson**

The SHP defendants move to exclude certain opinions and testimony proffered by plaintiffs' expert, Dr. Matthew Thompson. This motion will be denied.

Dr. Thompson is a board-certified pediatric pathologist who offers the opinion that Serenity's death was caused by oxygen deprivation precipitated by Hall's acute opioid withdrawal following the medication change on May 28, 2018. Dr. Thompson reviewed photographs of Serenity post-delivery and pre-autopsy, the autopsy report, and pathology slides of Serenity's internal

organs and the placenta.

Dr. Thompson based his opinion as to the cause and timing of the demise on his review of the pathology of the placenta and not on the "Genest" criteria used in assessing the degree of maceration of the fetus due to the fact that Serenity's body had not been preserved after her birth.

Defendants' motion to exclude is rather conclusory, arguing that Dr. Thompson is not qualified and his opinion is unreliable because he did not review the baby's actual organs. (Doc. 104 at 5-8). This is without merit.

Dr. Thompson gave a lengthy deposition in which he explained in detail the bases for his opinions. (Doc. 104-2). Defendants' criticism of Dr. Thompson goes to the weight a jury might afford his expert opinions, not admissibility.

###  3.   **Sara Ford**

The SHP defendants also move to exclude the opinion of Sara Ford, a vocational economic analyst who has offered an opinion on the loss of earning capacity of Serenity. (Doc. 104-6). This motion will also be denied.

While defendants find numerous faults with Ford's methodology and opinion, their argument boils down to the criticism that Ford based her estimate on "unknown" factors such as what Serenity's education, career, and life expectancy would have been. But in a wrongful death case, what would have occurred but for the

decedent's death is always unknown.

Ford relied on a variety of government statistics and publications to project a range of Serenity's lifetime earning power, using various assumptions regarding her age and level of education attained. (Doc. 104-6 at 28-33). If defendants have a basis to attack the reliability of such assumptions, they can cross-examine her at trial. And while they criticize her methodology, they did not take her deposition to lay a foundation for such a challenge.

Thus, defendants' critiques of Ms. Ford's opinions go to weight, not admissibility.

### 4.   Dr. Daniel Leino and Dr. Weslie Tyson

The final motion regarding proffered experts is plaintiffs' motion to exclude the opinions of Dr. Daniel Leino and Dr. R. Weslie Tyson. (Doc. 101). This motion will be granted as to Dr. Leino but denied as to Dr. Tyson.

Dr. Leino, of course, was the pathologist at Children's Hospital who performed the autopsy on Serenity. However, it is undisputed that Dr. Leino, in forming his opinion as to the cause of death for the autopsy report, *assumed that Serenity's body had been refrigerated during the three days between her delivery and her arrival at Children's Hospital*. (Leino Dep. 29, 37). Relying on that faulty factual premise, he assessed the condition of the baby's skin and organs, assuming them to have been the same at the

time of autopsy as they were at birth.

"Expert testimony, however, is inadmissible when the facts upon which he expert bases his testimony contradict the evidence." *Greenwell v. Boatwright*, 184 F.3d 492, 497 (6th Cir. 1999) (citation omitted). This fundamentally faulty premise, therefore, renders Dr. Leino's proposed expert opinion unreliable and thus inadmissible.

Perhaps anticipating that result, the SHP defendants retained a second pathologist, Dr. R. Weslie Tyson. Dr. Tyson also offers an expert opinion regarding the timing and causation of Serenity's death: an in utero umbilical cord accident predating the medication change. (Doc. 76-2). Dr. Tyson, however, *was* informed of the fact that Serenity's remains were not refrigerated prior to her transport to Children's Hospital. (Doc. 76-2 at 27). Therefore, his opinion does not suffer from the same factually flawed basis as Dr. Leino's.

Plaintiffs also attack Dr. Tyson's methodology and opinion on other grounds, but those arguments go to the weight of his opinion and not its admissibility. Plaintiffs may raise those issues on cross-examination.

Therefore, having carefully reviewed the record, and having heard from the parties, and being sufficiently advised,

**IT IS ORDERED** that:

53

(1)  The Kenton County defendants' motion for summary judgment (Doc. 77) be, and is hereby, **GRANTED;**

(2)  The Kenton County defendants' motion to exclude the opinion of Patrick Hurley (Doc. 96) be, and is hereby, **DENIED AS MOOT;**

(3)  Plaintiffs' motion to exclude the expert opinions of Dr. Daniel Leino and Dr. Weslie Tyson (Doc. 101) is **GRANTED AS TO DR. LEINO AND DENIED AS TO DR. TYSON;**

(4)  Plaintiffs' motion for summary judgment against defendants' Carrie Ray and LaShae Setters on the issues of duty and breach (Doc. 102) be, and is hereby, **DENIED.** For the reasons stated in the above opinion, plaintiffs' claims against defendant Setters are **DISMISSED WITH PREJUDICE;**

(5)  Plaintiffs' motion for summary judgment against defendant Mark Schaffield, MD on the issues of duty and breach (Doc. 103) be, and is hereby, **GRANTED;**

(6)  The SHP defendants' motion to exclude certain opinions and testimony of Matthew Thompson M.D. and Sara Ford (Doc. 104) be, and is hereby, **DENIED;**

(7)  The SHP defendants' motion for summary judgment (Doc. 105) be, and is hereby, **GRANTED AS TO DEFENDANT SETTERS AND DENIED AS TO DEFENDANT SCHAFFIELD;** and

(8)  **On or before July 25, 2022,** the parties shall file a joint status report regarding proposed trial dates and/or the

potential for settling the remaining claims in this matter.

This 5th day of July 2022.



Signed By:

***William O. Bertelsman*** WOB

**United States District Judge**